**UNITED STATES of America, Plaintiff,**

v.

**Eugene CALLABRASS, a/k/a Eugene Jones, Adie White and Raymond B. Cromer, Defendants.**

No. (S) 78 Cr. 282 (PNL).

United States District Court,
S. D. New York.

July 19, 1978.

As Amended Oct. 16, 1978.

Joseph I. Stone, New York City, for defendant Raymond B. Cromer.

Robert J. Saltzman, Bronx, N. Y., for defendant Eugene Callabrass.

Federal Defender Services Unit, The Legal Aid Society, by Jack S. Lipson, New York City, for defendant Adie White.

Robert B. Fiske, Jr., U. S. Atty. by Richard F. Lawler, Asst. U. S. Atty., New York City, for plaintiff.

## MEMORANDUM OPINION

LEVAL, District Judge.

This opinion addresses the motions of defendants Eugene Callabrass and Raymond B. Cromer to suppress statements made by them to an agent of the Drug Enforcement Administration.

### CROMER'S STATEMENT

The defendant Cromer moves to suppress a statement taken from him at the time of his post-indictment arrest. Since I find that the statement was taken from him in violation of his Sixth Amendment right to counsel, the motion is granted.

Cromer was indicted on June 6, 1978. In preparing to arrest him, Drug Enforcement Agent Edward Maher conferred with the Assistant United States Attorney in charge of the prosecution concerning warnings to be given Cromer before questioning. Mindful of a line of authority in this Circuit to the effect that warnings sufficient to comply with Fifth Amendment requirements as to pre-indictment interrogation "would not necessarily meet . . . the higher standard with respect to waiver of the right to counsel that applies [after indictment] when the Sixth Amendment has attached," *United States v. Massimo*, 432 F.2d 324, 327 (2d Cir. 1970), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 633 (1971), (Friendly, J., dissenting), *United States v. Satterfield*, 558 F.2d 655 (2d Cir. 1976), the Assistant wrote out some additional warnings which he instructed the agent to read to the defendant before questioning, together with the usual *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). The Assistant and the agent were on notice, by reason of Cromer's testimony before the grand jury, that he was represented by counsel.

Agent Maher placed Cromer under arrest at about 11:00 a. m. at his place of employment in Tarrytown, New York, and then read him his *Miranda* rights from a Drug Enforcement Administration card (GX 79). At the end of the reading, the defendant acknowledged his understanding of those rights and his election to waive them.

The agent continued the advice-of-rights by reading, as follows, from the handwritten paper prepared by the Assistant (GX 80):

> You have been indicted by a grand jury composed of citizens of the Southern District of New York for violations of the narcotics laws, specifically conspiracy, possession with intent to manufacture PCP, and possession with intent to distribute.
>
> This is a very very serious charge.[1]
>
> If you had a lawyer he or she would probably advise you not to say anything.

Maher asked the defendant if he understood this, and the defendant answered "Yes."

Maher then conducted the defendant to the D.E.A. headquarters on West 57th Street in New York City. Upon their arrival at approximately twelve noon, Cromer asked for permission to call his wife. Although he made the call, it is not clear whether he spoke to her. Maher then proceeded with fingerprinting and routine arrest processing. Upon its completion the agent asked Cromer whether he had ever written a General Foods order form for pepperdine and cyclohexanone. Cromer answered yes, that he had written several of them. Maher asked "Do you remember what you said in the grand jury?" and Cromer answered "I perjured myself." At that point Cromer asked to talk to his attorney. The questioning ceased, and Cromer placed a call to his lawyer.

I conclude that these answers to the agent must be suppressed.

First, I do not believe the Government has met the burden of showing a knowing and intelligent waiver of the Sixth Amendment right to counsel which attached at the time of the indictment. *See Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

The types of warnings or advices which the Government must give to show that a waiver after indictment was knowing and intelligent are nowhere clearly specified. In *Massimo, supra,* Judge Friendly, questioning whether post-indictment interrogation without counsel should ever be permitted in federal court, expressed the view that the Sixth Amendment exacted a higher standard for the demonstration of waiver than was required by the Fifth before indictment. 432 F.2d at 327. In the District Court opinion in *United States v. Satterfield,* 417 F.Supp. 293 (S.D.N.Y.1976), Judge Knapp, in suppressing a post-indictment statement, suggested that the warnings and explanations required are similar in type to those a court would use in determining whether a defendant should be permitted to proceed to trial without counsel. The Court of Appeals affirmed Judge Knapp's ruling. *Compare United States v. Lord,* 565 F.2d 831, 839–40 (2d Cir. 1977).

Both the District Court and the Court of Appeals in *Satterfield* cited *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), in which the Supreme Court wrote:

> . . . in order competently and intelligently to choose self-representation [a defendant], should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation omitted.]

█ Although the Assistant referred to the additional warnings which he wrote out for the agent as the "Satterfield warnings," I do not think that these warnings satisfied the thrust of the *Satterfield* opinions. The warnings he wrote were not designed to insure that the defendant understood the benefits to be gained from having counsel's

---

1. The line as written says "This is a very serious very charge." The agent said that when reading it he stumbled on the error and changed it to "a very very serious charge."

advice in those circumstances, but instead were themselves predictions of the advice that counsel might give. ("If you had a lawyer he or she would probably advise you not to say anything."). I do not think it necessary (or advisable) for a prosecutor to undertake to tell a defendant what advice his lawyer would give him. Such a practice can easily lead to serious problems, among them that it encourages the defendant to regard the prosecutor as the lawyer who is protecting his interests. It is particularly dangerous as to a defendant who already has counsel. *Compare, ABA Code of Professional Responsibility*, DR 7–104. The defendant may well forego consulting his own lawyer since he has received advice from another lawyer.

■ What seems rather to be called for, in addition to the usual *Miranda* warnings, is explanations along the following general lines: that a criminal indictment has been filed, with explanation of the significance of that fact; that the results of the defendant's case could be seriously affected by any statements he makes at this time; that defendants customarily obtain the advice of lawyers in these circumstances, and that a lawyer would be better able to understand and advise the defendant as to the desirability and the dangers of making statements and answering questions. The explanations necessary may of course vary depending on the age, experience and emotional condition of the defendant, as well as other factors.

I do not purport to be laying down a blue-print for post-indictment questioning. The above is submitted as one district judge's suggestion of the direction to follow in seeking to meet the higher standards which the Court of Appeals has ruled applicable under the Sixth Amendment. *See also United States v. Calabro*, 467 F.2d 973, 985 (2d Cir. 1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973).

■ Even had I concluded that the advice designed by the Assistant was a proper *Satterfield* warning, I would still be required to find that a waiver had not been adequately shown because of the manner of delivery and the sequence of advice and questioning. After the conventional *Miranda* advice, but before reaching the additional *Satterfield* material, agent Maher elicited from the defendant that he elected to waive his rights. However, after telling him that his lawyer would probably advise him not to say anything (and ascertaining that the defendant understood), the agent did not ask the defendant whether he was nonetheless willing to answer questions and to waive his right to have his lawyer present. Nor did the agent proceed immediately with the questions. The next hour or more was consumed in taking the defendant to New York and in fingerprinting and processing him, which involves many questions of a non-investigatory nature. It was not until the completion of this process that the agent asked, without reference back to the advice of rights, whether the defendant had written drug orders on a General Foods order form. Almost immediately, the defendant asked to call his lawyer. I do not find on these facts that the defendant, after hearing the supplemental advices read by the agent from the Assistant's handwritten paper, ever expressed a knowing waiver before answering the questions. Nor can waiver be inferred in these circumstances from the fact that he answered the questions.

■ A third reason why I find that the statements must be suppressed is the fact, taken in conjunction with the foregoing circumstances, that the defendant was already represented by counsel and the Government was on notice as to the representation. Whether and under what circumstances, or with what prior warnings, advices and waivers, the Government may permissibly question a defendant whom it knows to be represented after indictment and without either the presence or permission of counsel, I do not know. In the courts of New York State, no waiver given by a defendant in these circumstances will be credited unless it is given in the presence of his counsel. *See People v. Hobson*, 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976). The provisions of the *Code of Professional Re-*

*sponsibility*, DR 7–104(A) raise a doubt whether it is proper for a government lawyer to initiate questioning of an indicted defendant whom he knows to be represented. *See also Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

Without undertaking to answer the larger question, I find nothing in the present facts to justify the questioning. Nor do I consider whether a different result might follow if the questioning, unknown to the Assistant, were done by an agent who was unaware of the representation. In this case, since the Assistant specially prepared "*Satterfield* warnings" to be used by the agent in making the arrest, it is clear that the Assistant anticipated the questioning. In a sense it was done at his direction. Furthermore the agent testified that he also was aware of the circumstances which constituted notice of the representation.

The Government argues that it should not be considered to have been on notice as to Cromer's representation. I have no doubt that the Assistant had not focussed on this issue and was not deliberately bypassing counsel; I therefore suggest no ethical criticism. But I conclude that the Government was chargeable with notice. On April 12, 1978 the defendant, appearing in the grand jury, had testified that he had a lawyer who requested that the taking of a handwriting sample be delayed for two weeks so that the lawyer could be present. That conclusively establishes notice to the Government. While it may well be that at the time of arrest, the Assistant in charge had forgotten or failed to think about this episode, a defendant's right to counsel under the Sixth Amendment cannot turn on whether a prosecutor does or does not remember a notification of which he was admittedly aware.

The Assistant informed the court at the hearing of this motion that he now recalled some time in April having telephoned a lawyer whose name was furnished by the defendant and that the lawyer advised him he had received no fee and was not representing Cromer. Since the Assistant could not recall whether this phone call had occurred before or after the defendant's grand jury statement on April 12, and since the Assistant furthermore had no way of knowing whether the lawyer he called was the same one the defendant referred to on April 12, this fact is of no significance.

Nor does the fact that the defendant appeared in the grand jury twice after April 12 unaccompanied by a lawyer permit the Government to infer, as it argues, either that he had no lawyer or that he had permanently waived the right to have him present.

As to the first argument, there are many reasons why the lawyer might not have accompanied his client to the grand jury. He might have concluded after discussions, rightly or wrongly, that his presence was not required. Since a lawyer is not entitled to accompany his client into the grand jury, both lawyer and client may have regarded his presence as being of limited usefulness. Furthermore, lawyers cost money. Both lawyer and client may have decided to forego this luxury. There are many probable explanations, short of the conclusion that Cromer, contrary to his testimony of April 12, had no lawyer.

As to the Government's argument that it was permitted to infer from Cromer's appearance at the grand jury unaccompanied by his lawyer that he was waiving the right to have a lawyer present for questioning two months later after indictment, it is too frivolous to require discussion.

## CALLABRASS' STATEMENT

The defendant Callabrass moves to suppress a statement made by him on July 5, 1978, on the grounds that it was obtained in violation of his right to counsel and of an agreement between his attorney and the Government.

The facts are as follows. Callabrass was indicted on April 26, 1978. An agreement was made between his lawyer and the Assistant U.S. Attorney that the defendant would appear at Drug Enforcement headquarters on June 29, 1978, for the purpose

of giving a handwriting exemplar. Callabrass' lawyer asked whether it was necessary for him to accompany his client. Upon the Assistant's promise to the effect that Callabrass would not be questioned (the exact substance of the promise being the subject of further discussion below), the lawyer said he would not appear with Callabrass.

On June 29, Callabrass failed to appear. He did show up unexpectedly the following night, June 30 at 7 p. m., too late for the taking of the exemplar. The Government states that, while at DEA headquarters, Callabrass volunteered an incriminating admission.[2] In subsequent telephone conversations, the Assistant advised Callabrass' lawyer of the admission, and sought to make another appointment for the handwriting exemplar. On July 5, by telephone, the attorney agreed that Callabrass would appear for the handwriting exemplar that afternoon, again with the understanding requested by defense counsel that on the Assistant's continued promise to the effect that no questions would be asked, counsel would not accompany his client.

Agent Maher was responsible for taking the handwriting exemplar. Maher was aware that the Assistant had agreed with Callabrass' lawyer that there would be no questioning.

When Callabrass arrived at DEA headquarters, he was escorted by Maher to the room in which the exemplar was to be taken. At this point Callabrass said to Maher, "Let me look at the paper and I'll tell you if I wrote it." Maher said nothing, but showed Callabrass the suspected document. Callabrass said, "I wrote it." That is the statement to which this suppression motion is addressed.

The Government was of course bound by the restrictions contained in the Assistant's promise to defense counsel, who in reliance on that promise felt it was unnecessary to be present to protect his client. However, precisely what were the terms of the promise is not clear. In the course of colloquy

and an informal oral stipulation, the Assistant and defense counsel described the promise in several slightly different ways.

Among the formulations were: "that he would not be questioned there by the agents"; "He was to appear to give a handwriting exemplar and not to be questioned in any manner with reference to the note. . . . "; "There was a direction that they not inquire or talk to him or inquire into the substance of this case." At one point the Court asked whether it was the substance of the agreement "that nothing would be done except the handwriting sample. . . . " Neither lawyer expressed disagreement with that formulation.

■ It is clear on the one hand that had the agent questioned the defendant, even upon his invitation to do so, this would have violated the agreement. *See Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). On the other hand, it seems clear that had Callabrass volunteered a damaging admission, the Assistant's agreement would not have been violated by the agent's hearing, and subsequently testifying about, the admission. *Compare Cobbs v. Robinson*, 528 F.2d 1331, 1342 (2d Cir. 1975), *cert. denied*, 424 U.S. 947, 96 S.Ct. 1419, 47 L.Ed.2d 354 (1976); *United States v. Kaylor*, 491 F.2d 1127 (2d Cir. 1973), *sentence vacated and case remanded for resentencing*, 491 F.2d 1133 (2d Cir. en banc 1973), *judgment vacated and case remanded on other grounds sub nom. United States v. Hopkins*, 418 U.S. 909, 94 S.Ct. 3201, 41 L.Ed.2d 1155 (1974).

As to conduct that falls between explicit questioning and mere passive listening, I find that the Assistant communicated to defense counsel an assurance that nothing would be done to elicit admissions from the defendant, and in reliance on that understanding counsel allowed the defendant to go unaccompanied.

■ The agent's actions in showing Callabrass the paper amounted to less than

---

**2.** The motion to suppress that admission is not the subject of this opinion, but is reserved to trial.

questioning, but more than simply listening. It could be characterized as nothing more than complying with Callabrass' request to be shown the paper, or as including the implicit question "Did you write it?" It is clear, however, that the paper was exhibited for the sole purpose of eliciting the defendant's statement. The agent testified that he would not have shown the defendant the specimen before taking a handwriting exemplar were it not for the offer to admit authorship. Accordingly, I find that the showing of the document was an action intended to elicit an admission, and that it was thus barred by the agreement, as defense counsel was entitled to construe it.

This action deprived the defendant of the benefit of his attorney's agreement with the Government and thus of his right to assistance of counsel. The circumstances show no effective waiver by the defendant of the assistance of counsel or of the benefits of the agreement his counsel negotiated for him. *See Brewer v. Williams, supra.*

I find the statement must be suppressed.